**UNITED STATES of America, Plaintiff,**

v.

**LORAN MEDICAL SYSTEMS, INC., et al., Defendants.**

**No. CV 96–4283 SW (CWx).**

United States District Court, C.D. California.

Dec. 17, 1997.

Nora M. Manella, AUSA, Office of U.S. Attorney, Criminal Div., Los Angeles, CA, Jacqueline H. Eagle, Dept. of Justice, Office of Consumer Litigation, Washington, DC, for U.S.

Bent Formby, Santa Barbara, CA, pro se.

## AMENDED ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WILSON, District Judge.

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

### I. *Background*

On June 20, 1996, this court granted a temporary restraining order enjoining Defendants Loran Medical Systems, Inc., Bent Formby and Ernest Thomas, M.D. ("Defendants") from importing neonatal rabbit and human fetal cells (the "Cell Product") from Russia for use in the treatment of human diabetes. Defendants claim that injection of the Cell Product into diabetic patients can stimulate the body's production of insulin.

On July 1, 1996, the court entered a preliminary injunction against Defendants importation and use of the Cell Product on the grounds that the government had demonstrated a reasonable probability of success on

the merits of its claim—that the Cell Product fell within the Food and Drug Administration's ("FDA") regulatory authority pursuant to the federal Public Health Service Act (the "PHS Act"), 42 U.S.C. § 201, *et seq.* and the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*

Now before the court are the parties cross motions for summary judgment. Plaintiff seeks a permanent injunction against the unregulated use of the Cell Product, while Defendants argue that the Cell Product is outside of the FDA's regulatory authority. For the reasons stated below, the court finds that the FDA has authority over the Cell Product and GRANTS Plaintiff's request for a permanent injunction.

## II. Summary Judgment Standard

Summary Judgment is appropriate where there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In this case, the parties agree that there are no questions of fact. The case thus hinges on a purely legal question, an appropriate use of the summary judgment procedure.

## III. Analysis

The gravamen of this case is whether the Cell Product falls within the regulatory ambit of the FDA. The government argues that it does, pointing to regulations defining "biological product," which the FDA regulates pursuant to its authority under the Public Health & Service Act; and regulations involving "drugs" and "new drugs," which the FDA regulates under its Food and Drug Act authority.[1]

■ We review the decisions of administrative agencies according to the two-part test established in *Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* the first inquiry is whether Congress has directly spoken on the issue before the court. 467 U.S. at 842–43, 104 S.Ct. 2778. The parties agree that there is no statutory authority that directly speaks to the FDA's authority over the cell product. Under the second prong of the *Chevron* test, the court must determine whether the agency's position is a permissible construction of the relevant statute. *Id.* The court may only overturn the agency's interpretation if it finds that the interpretation "is not one that Congress would have sanctioned." *Id.* at 845, 104 S.Ct. 2778 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)).

### A. The Cell Product is a Biological Product

■ A biological product is any "virus, therapeutic serum, toxin, antitoxin or *analogous product* applicable to the prevention, treatment or cure" of human diseases or injuries. 21 C.F.R. § 600.3(h) (emphasis added); *see also* 42 U.S.C. § 262(a). A product is analogous to a toxin or anti-toxin if, irrespective of its source or origin, it can be used in the treatment of disease through a "specific immune process." 21 C.F.R. § 600.3(h)(5)(iii).

The human immune system will naturally react to the injection of any cellular material, whether obtained from a human or non-human source. Defendants inject the Cell Product into an area of the abdomen selected specifically to evade this response and thus reduce the chance that the cells will be rejected. This procedure purportedly allows the rabbit cells to begin producing insulin immediately while the human fetal cells mature.

The government argues that this attempt at evading the body's natural immune system is a "specific immune process" as required by the FDA's regulations. Defendants read the regulation more narrowly. Defendants rely on the Court of Custom and Patent Appeals opinion in *Certified Blood Donor Services Inc. v. United States,* 62 C.C.P.A. 66, 511

---

**1.** Whether a substance is a biological product and a drug will determine which approval process applies. *Compare* 21 U.S.C. § 355 (FD & C Act) *with* 42 U.S.C. § 262 (PHS Act). The distinction is not relevant in this case, however, because both statutes require premarket approval by the FDA, which defendants concede they have not obtained. The only issue before the court is thus whether the Cell Product is properly within the FDA's regulatory authority.

F.2d 572 (1975), in support of their argument that a substance analogous to a toxin or antitoxin must be used to treat diseases through specific immunization. Defendants' reliance, however, is misplaced. The issue before the court in *Certified* was whether a serum used for diagnosis rather than treatment fell within the regulatory definition of biological product. 511 F.2d at 575. Moreover, the regulatory language cited, but not relied upon, by the court in *Certified* is an outdated version of the regulation. The current language was adopted by the FDA in 1973. Accordingly, *Certified* does not bear on this case.

Defendants also argue that the PHS act only authorizes the FDA to regulate products which immunize against a specific disease, such as polio or smallpox. The court disagrees. As described in greater detail below, Congress conferred upon the FDA the broad statutory authority to regulate products *analogous to* toxins, antitoxins, vaccines, blood, etc. *See* 42 U.S.C. § 262(a). The FDA's assertion of authority over immunological agents such as the Cell Product is a reasonable construction of the PHS Act.

### 1. *The Cell Product is Analogous to a Toxin or Antitoxin*

Defendants next argue that even if the Cell Product does use a specific immune process, the FDA does not have regulatory authority under the PHS Act because the Cell Product is not analogous to a toxin or antitoxin. Defendants rely on the Fifth Circuit's decision in *Blank v. United States,* 400 F.2d 302 (1968), which held that blood and plasma were not analogous to therapeutic serums because they were not employed for immunological purposes, they merely replaced blood lost through disease or injury. 400 F.2d at 304. Accordingly, the *Blank* court held that the FDA did not have regulatory authority over blood and plasma. *Id.* at 305. Defendants argue that like blood, the Cell Product merely replaces cells that have been lost to disease, in this case diabetes.

*Blank* rested heavily on the fact that the FDA had not promulgated regulations that could be read to include blood within the definition of a product analogous to a thera-

peutic serum. 400 F.2d at 303–04. In this case, however, the regulations defining products analogous to toxins and antitoxins appear to encompass the Cell Product. *See* 21 C.F.R. § 600.3(h)(5)(iii) (a product is analogous to a toxin or antitoxin if, irrespective of source or origin, it is applicable to the treatment of human disease through a specific immune process). Thus, to the extent the *Blank* analysis relied on the paucity of regulatory authority, it does not apply in this case.

The *Blank* court also noted that blood transfusions were unknown to Congress when it enacted the PHS Act in 1902, therefore, it could not have intended blood to be analogous to a therapeutic serum. 400 F.2d at 303. Defendants argue that the Cell Product was similarly unknown to Congress when it last amended the PHS Act. *Blank,* however, was contrary to the Supreme Court's holding in *In re Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), that administrative agencies must be able to adapt to changing circumstances. 390 U.S. at 784, 88 S.Ct. 1344; *see also Chevron,* 467 U.S. at 862, 104 S.Ct. 2778 (an agency should have broad discretion to implement the policies of the organic acts). The FDA has construed its mandate under the PHS Act to include a broad spectrum of biological products used in the treatment of disease. The court cannot say that the FDA's construction was unreasonable.

### 2. *Whether the Cell Product is Biologically or Chemically Altered is Irrelevant to Whether it is a Biological Product*

Defendants argue that the Cell Product cannot be a Biological Product under 42 U.S.C. § 262(a) because it is not biologically or genetically altered in any way. Somatic Cell Therapy—medical treatment using biologically altered cells—is regulated under the FDA's authority to regulate biological products. *See* 58 Fed.Reg. 53250; FDA, *Points to Consider in Human Cell Therapy and Gene Therapy* 4 (Aug. 27, 1991) (listing examples of somatic cell therapy). But nothing in the regulation *requires* alteration before a

product is to fall under the FDA's purview.[2]

Accordingly, the court finds that the FDA's conclusion that the Cell Product is a biological product that uses a specific immune process is reasonable, and thus the Cell Product is properly under the FDA's authority.

### B. *The Cell Product is Properly Classified as a New Drug Under the FD & C Act*

#### 1. *The Cell Product is a Drug*

■ The FD & C Act defines drugs as, *inter alia*, "articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in [humans]." 21 U.S.C. § 321. The Cell Product was developed for use in the treatment of diabetes. Thus, it meets the statutory definition of a drug.

Defendants argue that the statutory definition is overbroad—that it encompasses a wide variety of items that fall outside the plain meaning of the word "drug." Defendants' argument relies on two cases, both inapposite to the present case. First, Defendants argue that under *Juneau v. Interstate Blood Bank of Louisiana,* 333 So.2d 354 (La.App.1976), tissue samples are not drugs under the Louisiana State Food and Drug Act. 333 So.2d at 357. It may very well be true that the Louisiana definition of drug excludes the Cell Product, however, that definition has no relevance to this case. The question before the court is whether the *federal* FD & C Act's definition properly encompasses the Cell Product.

Second, Defendants argue that there is a conflict between the plain language of the statute and Congress' intent when it was enacted. Accordingly, although the Cell Product clearly falls within the plain language of the FD & C Act's definition of drug, the plain wording does not control. Defendants argue that the 1951 case of *62 Cases, More or Less, Each Containing Six Jars of*

*Jam v. United States,* 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566 (1951), somehow supports their argument. In *62 Cases of Jam,* however, the Court addresses the problem of conflicting statutory definitions. 340 U.S. at 594, 71 S.Ct. 515. Here, there is no conflict—only a broad statutory definition of "drug." Defendants have provided no authority for why the statutory definition should not apply.

In contrast, Plaintiffs correctly argue that Congress intended a an expansive definition of "drug." "Congress fully intended that the [FD & C] Act's coverage be as broad as its literal language indicate." *United States v. Article of Drug ... Bacto–Unidisk,* 394 U.S. 784, 798–99, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969) (holding that a "antibiotic sensitivity disk," a device used in laboratories to help choose particular antibiotics for treatment was a drug according to the statutory definition). "[R]emedial legislation such as the Food, Drug and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health." *Grand Laboratories, Inc. v. Harris,* 660 F.2d 1288, 1291 (8th Cir.1981) (en banc) (holding that animal biologics—products prepared from animal tissue for the treatment of disease in animals—were drugs under the statutory definition).[3] In interpreting the FD & C Act, the court's duty is to "avoid any construction which would result in the free marketing of drugs which might well be unsafe." *United States v. Western Serum,* 666 F.2d 335, 341 (9th Cir.1982). Classifying the Cell Product as a drug is consistent with Congress' intent to give the FDA broad authority in this important area.

#### 2. *The Cell Product is a "New Drug"*

All new drugs must undergo premarket review by the FDA. 21 U.S.C. § 355(a). A new drug is any drug that is not already *generally recognized* among medical experts as safe and effective for its intended use. 21 U.S.C. § 321(p). The exception for "general-

---

2. Because biological or genetic alteration is not relevant to the question of the FDA's authority, the Court will not decide the statutory question.

3. Defendants cite *Grand Laboratories* for the opposite proposition—that animal biologics are outside the FDA's statutory authority. This *en banc*

decision reverses two lower court decisions adopting a more narrow construction of the statute. *See Grand Laboratories, Inc. v. Harris,* 488 F.Supp. 618 (D.S.D.1980); *Grand Laboratories, Inc. v. Harris,* 644 F.2d 729 (8th Cir.1981) *both rev'd by* 660 F.2d 1288 (8th Cir.1981).

ly recognized" drugs is very narrow. *United States v. Undetermined Quantities ... Equidantin,* 675 F.2d 994, 1000 (8th Cir.1982). The court's task is to determine whether the drug has a general reputation in the scientific community for safety and effectiveness, not to make an independent determination of these characteristics. *Id.*

■ The inquiry into whether a drug is generally recognized has three parts:

(1) There must be a consensus of expert opinion that drug product is safe and effective for its labeled indications. *Weinberger v. Hynson, Westcott and Dunning,* 412 U.S. 609, 632, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973);

(2) That expert consensus must be based upon adequate and well-controlled clinical investigations conducted on the drug product in issue. *Id.* at 630, 93 S.Ct. 2469;

(3) The studies conducted on the drug must be published in the medical literature and available to experts generally. *Equidantin,* 675 F.2d at 1000.

■ A proponent's failure to provide substantial evidence on *any one* of these conditions means that the substance is a new drug as a matter of law. *United States v. Articles of Drug (Promise Toothpaste),* 826 F.2d 564, 569 (7th Cir.1987). The Cell Product fails all three. While Defendants make sweeping arguments about the worldwide acceptance of the product, they fail to provide specific examples of successful clinical trials or published studies. Moreover, while Defendants provide anecdotal evidence of clinical success, the declarations of Plaintiffs' experts demonstrate that there is a marked lack of consensus in the medical community as the to the effectiveness of the Cell Product. *See Simeon Management Corp. v. FTC,* 579 F.2d 1137, 1142 (9th Cir.1978) (anecdotal evidence or a doctors belief that a drug is effective is not substantial evidence of general acceptance).

Accordingly, the court finds that the FDA has acted reasonably in classifying the Cell Product as a new drug.

C. *The Experimental Use of the Cell Product is Not the "Practice of Medicine"*

■ The court disposes quickly of defendants' argument that the FDA's exercise of authority over the Cell Product is an attempt to regulate the practice of medicine—an area traditionally left to the states. While the FD & C Act "was not intended to regulate the *practice of medicine,* it was obviously intended to control the *availability of drugs* for prescribing by physicians." *United States v. Evers,* 643 F.2d 1043, 1048 (1981). The court has already determined that the Cell Product is a drug. Accordingly, the FDA has the authority to regulate its use.

### III. CONCLUSION

The Cell Product is both a biologic product and a new drug, thus, the FDA has regulatory authority over the Cell Product under the PHS Act and the FD & C Act. The Court GRANTS the government's motion for summary judgment and enters a PERMANENT INJUNCTION against Defendants' importation, use and sale of the Cell Product.

IT IS SO ORDERED.